[Cite as *In re N.M.*, 2014-Ohio-4783.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: N.M.

C.A. Nos.    27400
               27403

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    DN 12-12-0755

DECISION AND JOURNAL ENTRY

Dated: October 29, 2014

MOORE, Judge.

{¶1}   Appellants, Jessica T. ("Mother") and Michael M. ("Father"), appeal from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights to their minor child and placed her in the permanent custody of Summit County Children Services Board ("CSB").  This Court affirms.

I.

{¶2}   Mother and Father are the natural parents of N.M., the only child at issue in this appeal.  Although Mother had two older children who were not the children of Father, she lost custody of them several years before N.M. was born.  Aside from CSB's concerns about Mother's limited cognitive ability, few facts about the prior juvenile cases are set forth in the record of this case.

{¶3}   N.M. was born on May 25, 2012, with a congenital heart defect, which required extensive ongoing medical care. She remained hospitalized at Akron Children's Hospital for

several months after her birth. Because CSB had concerns about Mother's ability to meet N.M.'s basic and special needs, it developed a voluntary case plan with both parents shortly after N.M.'s birth. A primary component of the voluntary plan was for the parents to receive training from hospital personnel and ultimately demonstrate that they had the ability to care for N.M.'s special medical needs at home.

{¶4} N.M.'s specific medical needs have changed over time, but she has always required a ventilator to help her breathe and a gastrostomy tube to provide nutrition directly into her stomach because she cannot take food orally. As N.M. grew older, her medical providers began weaning her off the ventilator for limited periods of time during the day. While N.M. is off the ventilator, it is essential that the tracheostomy tube in her neck remain clear and properly connected to allow her to continue breathing. N.M.'s caregivers must know how to operate, monitor, and clean all of her medical devices. Her caregivers must also be able to recognize N.M.'s cues that she needs medical assistance and know when and how to personally administer that aid and/or seek help from medical professionals.

{¶5} According to N.M.'s pediatric pulmonologist, because she is not strong enough to breathe on her own and is too young to care for her own medical needs, she requires "[c]onstant supervision by a knowledgeable caregiver" or she could die. Although the training takes several hours over a period of a few weeks, he opined that it is not very difficult for a typical person to learn how to meet N.M.'s special medical needs. Before the pulmonologist would approve non-medical professionals to care for N.M., they must demonstrate in a hospital setting that they can provide her medical care for a period of 24 hours without assistance from the hospital staff. He further explained that N.M. required two trained family members in her home at all times.

{¶6} Pursuant to the voluntary case plan, both parents began training with N.M.'s medical providers at Akron Children's Hospital. From the beginning, however, Father insisted that he knew how to care for his own child and was reluctant to work with CSB or N.M.'s medical providers. At some point during the training, Father became so agitated that he threatened to kill the caseworker or anyone else who tried to take his child away from him. After that outburst, Akron Children's Hospital refused to train Father and banned him from the hospital.

{¶7} Although Mother continued the training, the hospital staff expressed concern that she did not understand the significance of N.M.'s medical needs or how to care for her. On December 5, 2012, because N.M. was ready to be released from the hospital and neither parent was prepared to meet her special medical needs, CSB filed this involuntary case and N.M. was placed in its emergency temporary custody.

{¶8} The trial court later adjudicated N.M. a dependent child based on an agreement of the parties. N.M. was initially returned to her parents' custody under an order of protective supervision by CSB. The parents agreed to live with a relative who would assist them in caring for N.M.

{¶9} Less than a month later, however, N.M. was removed from her parents' custody because she received serious head injuries that were determined to have been deliberately inflicted. Although the trial court initially believed that Father had inflicted the injuries and ordered that he have no contact with N.M., Mother later confessed that she had injured N.M. The parents would later give contradictory statements about who had caused N.M.'s injuries, but only Mother was prosecuted and convicted for the incident. Mother was placed on probation and both parents were permitted to have supervised visitation with N.M.

{¶10} N.M. was placed in the temporary custody of CSB, where she remained throughout the remainder of the case. Because Mother had been convicted of injuring N.M. and lacked the cognitive ability to understand how to meet her medical needs, the reunification plan focused on Father and another family member learning how to care for N.M. Over the course of the next year, however, no other family member completed the medical training and Father had been unable to complete training at another facility because he did not seek mental health treatment for his volatile behavior.

{¶11} CSB ultimately moved for permanent custody of N.M. Following a hearing on the motion, the trial court found that N.M. could not be placed with either parent within a reasonable time or should not be placed with them and that permanent custody was in her best interest. Consequently, it terminated parental rights and placed N.M. in the permanent custody of CSB.

{¶12} Mother and Father separately appealed and their appeals were later consolidated. Mother raises two assignments of error and Father raises one. For ease of review, Father's sole assignment of error will be consolidated with Mother's first because they are closely related.

II.

**FATHER'S ASSIGNMENT OF ERROR**

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT TERMINATED FATHER'S PARENTAL RIGHTS AND GRANTED PERMANENT CUSTODY TO [CSB,] WHICH WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**MOTHER'S ASSIGNMENT OF ERROR I**

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT TERMINATED MOTHER AND FATHER'S PARENTAL RIGHTS AS THE [JUDGMENT] WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶13} Father and Mother argue that the evidence before the trial court failed to support the permanent custody decision. R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody to a public children services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) apply, and (2) permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶14} The trial court found that N.M. could not or should not be placed with Mother because her parental rights to two older siblings had been involuntarily terminated several years earlier and she failed to demonstrate that she could care for this child. *See* R.C. 2151.414(E)(11). Both parents concede that the evidence presented at the hearing supported the trial court's finding under R.C. 2151.414(E)(11).

{¶15} They challenge the trial court's finding under R.C. 2151.414(E)(1) that, "notwithstanding reasonable case planning and diligent efforts by the agency," Father failed to substantially remedy the conditions that caused N.M. to be placed outside the home. *See* R.C. 2151.414(E)(1). Father and Mother acknowledge that Father failed to complete the training required to meet N.M.'s special medical needs, but argue that he was not able to do so because CSB failed to exert "reasonable case planning and diligent efforts" to connect him with another medical facility that would train him.

{¶16} The record reveals, however, that Father's inability to obtain the requisite medical training was not the result of a lack of effort by CSB. The trial court heard overwhelming

6

evidence that CSB had been unable to coordinate Father's training through another medical facility because Father was unable to control his volatile and intimidating behavior and refused to address the mental health component of the case plan. *See, e.g., In re Archer*, 3d Dist. Allen Nos. 1-03-89 and 1-03-90, 2004-Ohio-2916, ¶ 14; *In re Yates*, 6th Dist. Lucas No. L-91-292, 1992 WL 313216, *4 (Oct. 30, 1992).

{¶17} Father's initial training at Akron Children's Hospital was discontinued because his threats to kill the caseworker intimidated hospital staff and he was banned from the hospital for life. Father eventually conceded that the incident at Akron Children's Hospital was his fault, but he refused to take sufficient action to remedy his anger management problems. Although CSB attempted to arrange for Father to be trained at other medical facilities, those facilities were not willing to train him until he addressed his mental health problems and demonstrated an ability to control his behavior.

{¶18} Although the parents suggest that Father's intimidating behavior was limited to one incident at Akron Children's Hospital, the record reflects otherwise. Several witnesses testified about different incidents in which Father's offensive behavior interfered with his ability to participate in case planning services. Father had threatened or intimidated caseworkers, the guardian ad litem, the foster parents, and/or medical providers. Many of these incidents occurred after Father had completed anger management classes and some had occurred as recently as a few weeks before the permanent custody hearing.

{¶19} Each witness described a similar pattern of behavior: Father became angry, paced around the room, spoke very loudly, and used threatening language. The witnesses further explained that, during each incident, those around Father became uncomfortable and/or feared for their own safety. Both caseworkers testified that N.M. seemed to be afraid of Father,

particularly when he became loud or angry. One described N.M.'s physical reaction of tensing up when Father became angry. The other caseworker observed that N.M. became upset when Father approached her and that she did not react that way to anyone else.

{¶20} N.M.'s pediatric pulmonologist at Cleveland Clinic testified to Father's behavior during one of N.M.'s medical visits. After Father began pacing, ranting, and disrupting the examination, the doctor asked Father to leave the exam. He observed that Father's behavior made everyone in the room uncomfortable and admitted that he felt concerned for his own safety during Father's outburst. Given the intimidating behavior that he had observed, the doctor testified that he would be apprehensive about Father receiving medical training at Cleveland Clinic.

{¶21} Since the adoption of the first case plan during March 2013, Father had been required to address his mental health and anger management issues by completing anger management classes, obtaining a mental health assessment, and following any treatment recommendations. Although Father completed anger management classes, witnesses testified that he was still unable to control his anger. Throughout this case, Father had refused to obtain a mental health assessment or seek mental health treatment because he did not believe that he had a problem.

{¶22} By the time of the permanent custody hearing in April 2014, Father still had not obtained a psychological evaluation or started counseling. CSB remained concerned that Father has "significant mental health issues that have not been addressed." The caseworker and the guardian ad litem both testified about recently observing Father lose control of his anger.

{¶23} Father has failed to demonstrate that his failure to receive training in how to care for N.M.'s special medical needs was the result of a lack of reasonable reunification efforts by

CSB. The record instead demonstrates that Father's refusal to comply with the mental health component of the case plan prevented him from making progress on the reunification goals of the case plan. Therefore, there was substantial evidence before the trial court to support its conclusion that Father had failed to substantially remedy the conditions that caused N.M. to be removed from the home, "notwithstanding reasonable case planning and diligent efforts by [CSB.]" *See* R.C. 2151.414(E)(1).

**{¶24}** Father also challenges the trial court's finding that permanent custody was in N.M.'s best interest. When determining whether a grant of permanent custody is in the child's best interests, the juvenile court must consider all the relevant factors, including those enumerated in Revised Code Section 2151.414(D): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, and the need for permanence in her life. *See In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL 5178, *3 (Jan. 2, 2002); *see also In re Palladino*, 11th Dist. Geauga No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.

**{¶25}** Throughout most of this case, Father's interaction with N.M. was limited to weekly supervised visits. Witnesses observed that, although Mother attempted to care for N.M. during visits, Father did not. They also observed that N.M. did not appear to be comfortable around Father and did not look to him for support. As noted already, when Father became angry, N.M. became even more uncomfortable around him.

**{¶26}** Because N.M. was less than two years old at the time of the hearing, the guardian ad litem spoke on her behalf. She opined that permanent custody was in the child's best interest

because neither parent had the ability to provide for her special medical needs and she did not believe that they would be able to do so in the near future. She shared the concern of the caseworker and other witnesses that Father did not work on the reunification goals of the case plan but was instead confrontational with her and other people involved in this case. She gave examples of intimidating statements that Father had made to her and she stated that there were times when she did not feel safe around him.

{¶27} N.M. had spent most of her life living outside her parents' home. During the brief period that she did reside with them, she sustained serious, abusive injuries. Neither parent fully accepted responsibility for inflicting the injuries, nor did either acknowledge that, regardless of who inflicted the injuries, the other parent had failed to protect their medically fragile infant from abusive trauma. Because N.M. had spent much of her young life living in different temporary placements, she was in need of a legally secure permanent placement. Because her parents could not provide her with such a placement and CSB had been unable to find a suitable relative who was willing and able to do so, the trial court reasonably concluded that permanent custody was the appropriate disposition to provide her with a stable home.

{¶28} Because the trial court had clear and convincing evidence before it to establish both prongs of the permanent custody test, it did not err in terminating parental rights. Father's sole assignment of error and Mother's first assignment of error are overruled.

## MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT TERMINATED THE PARENTAL RIGHTS OF THE MOTHER AND FATHER EVEN THOUGH NO MEMBERS OF THEIR EXTENDED FAMILIES WERE EVER GIVEN AN OPPORTUNITY TO REUNITE WITH THE CHILD.

{¶29} Mother next argues that the trial court committed plain error by terminating parental rights despite the fact that the case plans had not been signed by either of the parents nor did CSB indicate on the plans whether it had attempted to reunify N.M. with members of the extended family. We note that both parents were represented by counsel and during the course of the proceedings, neither counsel argued that the failure to sign the case plans was substantively prejudicial to either parent. In addition, counsel did not suggest that CSB had failed to attempt to find suitable family members to care for the child. Instead, Mother relies on this Court's reasoning in *In re S.R.*, 9th Dist. Summit No. 27209, 2014-Ohio-2749, which pointed to the lack of the father's signature and other deficiencies of the written case plan to highlight that, without any legitimate explanation, CSB had failed to involve the father and his extended family in any case planning or reunification efforts.

{¶30} However, unlike the circumstances in *In re S.R.*, where the father was not included in the case plan whatsoever, in this case, even if there are deficiencies in the written case plans, the record clearly reveals that CSB involved both parents and their extended families in the case planning process and that both parents were provided with their case plans. As explained above, CSB attempted to work with Father to address his mental health issues and to obtain the necessary medical training to enable him to care for N.M, which were central goals included in his case plan.

{¶31} The record further reflects that CSB reached out to the extended family to attempt to find suitable caregivers for N.M. At the hearing, the caseworker testified that she had spoken to two different relatives who had expressed a willingness to care for N.M. and obtain the medical training, but that neither of them followed through. Although the paternal grandmother testified at the hearing that she was willing to complete the medical training with a family friend

and find appropriate housing for N.M., she admitted that she had not yet taken any of those steps. Moreover, she had not informed the caseworker about her willingness to care for N.M. until the day before the permanent custody hearing.

{¶32}  Therefore, as in her prior assignment of error, Mother has failed to demonstrate that CSB failed to exert reasonable reunification and case planning efforts in this case.  Mother's second assignment of error is overruled.

### III.

{¶33}  The parents' assignments of error are overruled.  The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

BELFANCE, P. J.
CARR, J.
CONCUR.


APPEARANCES:

MADELINE LEPIDI-CARINO, Attorney at Law, for Appellant.

NEIL P. AGARWAL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

JOSEPH M. KERNAN, Guardian ad litem.